## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| BRIDGET ADAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case Number: |
| v. | ) | 2:17-cv-01772-JEO |
| | ) | |
| JEFFERSON COUNTY | ) | |
| DEPARTMENT OF HEALTH, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

### <u>MEMORANDUM OPINION</u>

This is an employment discrimination case.  In it, Plaintiff Bridget Adams claims that the Jefferson County, Alabama, Department of Health ("JCDH") is liable under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., for subjecting her to adverse treatment "on the basis of gender non-conformity, gender stereotyping, and gender."  (Doc.[1] 24, Second Amended Complaint, ¶ 1).  Plaintiff also brings claims under 42 U.S.C. § 1983 against her direct supervisor, Facilities Manager Jackie Henderson, and the JCDH's Human Resources Manager, Dolores Johnson, to recover for alleged race discrimination in violation of 42 U.S.C. § 1981 and the Equal Protection Clause of the Fourteenth Amendment.  The cause now comes to be heard on Defendants' joint motion to

---

[1] References to "Doc(s). ___" are to the document number(s) of the pleadings, motions, and other materials in the court file, as compiled and designated on the docket sheet by the Clerk.

dismiss for failure to state a claim upon which relief can be granted, under Fed. R. Civ. P. 12(b)(6). (Doc. 26). For the reasons that follow, the court[2] concludes that Defendants' motion is due to be granted.

## I. LEGAL STANDARDS

Rule 12(b)(6), Fed. R. Civ. P., authorizes a motion to dismiss all or some of the claims in a complaint on the ground that its allegations fail to state a claim upon which relief can be granted. That provision is read, in turn, in light of Rule 8(a)(2), Fed. R. Civ. P., which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests," *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court is required to accept the well-pled factual allegations of the complaint as true and give the plaintiff the benefit of all reasonable factual inferences. *See Hazewood v. Foundation Financial Group, LLC*, 551 F.3d 1223, 1224 (11th Cir. 2008) (per curiam). However, "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (*quoting Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009) ("Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery

---

[2] The parties have consented to an exercise of plenary jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (Doc. 15).

for a plaintiff armed with nothing more than conclusions.").  Nor is it proper to assume that the plaintiff can prove facts it has not alleged or that the defendants have violated the law in ways that have not been alleged.  *Twombly*, 550 U.S. at 563 n.8 (citing *Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 526 (1983)).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.*, 550 U.S. at 555 (citations, brackets, and internal quotation marks omitted).  "Factual allegations must be enough to raise a right to relief above the speculative level ...." *Id.*  Thus, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" *i.e.*, its "factual content ... allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citations omitted).  "[I]n practice, a complaint … must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under *some* viable legal theory." *Twombly*, 550 U.S. at 562 (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984) (internal quotation marks omitted; emphasis and omission in original)).

## II.    BACKGROUND

### A.    Allegations of the Second Amended Complaint[3]

Plaintiff is a Caucasian female. (¶ 13)[4].  She began working for the JCDH in about November 1997.  (¶ 16).  Her current job title is "Print Shop/Mail Room Supervisor."  (¶ 16).  Her direct supervisor is Henderson, an African American male.   (¶ 6).  That is despite the fact that the JCDH has not allowed Henderson to supervise any other female employees since he was accused of assaulting his ex-wife.  (¶ 32).

According to Plaintiff, she "does not conform to gender stereotypes." (¶ 28). In particular, she "does not dress as a traditional female." (¶ 28).  Instead, she "presents herself in a masculine manner" (¶ 29) by wearing "masculine clothing" (¶ 31) and "her hair very short" and by not wearing "any make up or jewelry."  (¶ 30).  Plaintiff is the only female in her department or working under Henderson's supervision that does not conform to gender stereotypes.  (¶ 75).

Plaintiff first assumed a supervisory position at the JCDH over fifteen years ago.  At that time, she had seven employees working in her department, while now she has only one.  (¶ 18).  Plaintiff has made repeated requests to Henderson and

---

[3] The "Background" section is based upon the well-pled factual allegations of the complaint, which, consistent with the applicable standard of review, are taken as true, drawing all reasonable inferences in Plaintiff's favor.  Thus, these are the background facts for the purposes of the motion only; they may not be the actual facts.

[4] References herein to "(¶ ___)" are to the paragraph of the Second Amended Complaint.  (Doc. 24).

the JCDH's Director of Finance, Rodney Holmes, for additional staff. (¶¶ 19, 21, 22). All of those requests, however, have been denied. (¶ 20). Correspondingly, with Plaintiff's staff shrinking, her workload has "substantially increased" to the point that, for more than the last four years, she has been "forced to perform the duties of two separate positions." (¶¶ 24, 25, 73). This was confirmed, Plaintiff avers, "when her job was evaluated as part of a job survey[,] and it was determined that [she] is performing duties outside her job classification." (¶ 41; *see also* ¶ 48). Plaintiff says she thus "is performing the jobs of two separate job classifications and set[s] of job duties without pay or compensation for these additional job duties and without the correct job classification." (¶ 44). In an effort to remedy that state of affairs, Plaintiff, who the JCDH classifies as a "grade 22" (¶ 52), "has repeatedly requested to be reclassified and to receive premium pay to compensate her for the [additional] work she has been and continues to perform." (¶ 23; *see also* ¶¶ 46, 48, 71, 90, 119, 140). But those requests have also all been denied. (¶¶ 26, 87).

Plaintiff alleges, however, that female employees who conform to gender stereotypes and African American employees "are paid within their proper job classification and [are] classified properly, or [are] classified higher than required and [are] paid more than required for the work they perform." (¶ 42; *see also* ¶¶ 75-76, 121, 129, 130). In particular, Plaintiff claims that "African American

employees that do not perform the same amount or type of work as Plaintiff are incorrectly classified at a higher classification/grade than Plaintiff when they perform substantially less work." (¶ 130). Likewise, Plaintiff asserts that the Health Department has awarded "premium pay" to African American employees and to female employees that conform to gender stereotypes. (¶¶ 26, 74, 122, 136). Plaintiff further alleges that Defendants Henderson and Johnson both "had input in the decisions to incorrectly classify Plaintiff, deny Plaintiff pay and require [her] to perform duties outside her job classification." (¶ 138).

Plaintiff avers that, although she "is a good employee" (¶ 17) and her "prior performance evaluations were good," (¶ 84), Henderson gave her "poor performance evaluations based on false allegations." (¶ 33). He did so, Plaintiff claims, both "because of her nonconformity with female gender stereotypes" (¶ 33) and "because of her race." (¶ 34). In turn, Plaintiff claims that her "pay, job grade and classification, as well as her benefits were negatively impacted by these poor performance evaluations, in that Plaintiff was denied pay, a higher job classification/grade and her retirement benefits have not increased because she has been denied pay and pay raises." (¶ 35). On the other hand, she alleges, "African American employees … have engaged in conduct that should have caused them to receive poor performance evaluations, lower pay, and a lower job classification." (¶ 36).

Plaintiff identifies two named employees who purportedly received more favorable treatment than she did. The first is Johnson, whom Plaintiff cites as receiving "premium pay." (¶¶ 26, 122). The other is LaMonte Augustus, an African American male classified as a "grade 24," by which he is paid approximately 15% more than Plaintiff. (¶¶ 51, 130). Plaintiff does not specify Augustus's job title or duties. She does generally allege, however, that he is "performing less duties" than she is (¶ 130) and that "he does not perform the work of [his] pay grade and should be classified lower." (¶ 51). She also claims that he engaged in conduct that should have caused him "to receive poor performance evaluations, lower pay, and a lower job classification." (¶ 36). Specifically, Plaintiff claims that Augustus "does not perform his job duties satisfactorily" (¶ 53) and that he harassed employees under his supervision because of sex and race. (¶¶ 36, 53). Plaintiff adds that, in the wake of employee complaints about such harassment, the JCDH took away Augustus's supervisory authority (¶ 36), although Plaintiff also contends he "has not been disciplined or demoted." (¶ 53).

Next, Plaintiff claims she was "harassed" (¶ 40) and "disciplined around February 2016 for her time off from work, and [was] disciplined regarding her … sick leave." (¶ 37). She says that such "harassment" and "discipline" were "unjust" because she followed policy in taking time off (¶ 37) and were motivated by her race and her non-conformity with gender stereotypes. (¶ 40). She further

asserts that "female employees that conform to gender stereotypes" and African American employees "have not been disciplined regarding their sick time in the same manner as Plaintiff." (¶¶ 38, 39). In particular, she says Augustus "abused time and was not disciplined." (¶ 85). Plaintiff also contends that she has been subjected to conduct "so severe or pervasive as to create a racially harassing and discriminatory working environment." (¶ 163).

Finally, Plaintiff makes numerous broad allegations to the effect that Defendants have a pattern and practice of discriminating both against female employees that do not conform to gender stereotypes (¶ 97) and particularly against non-African American employees. (¶¶ 50, 54-58, 124, 129-132, 135, 143, 146, 147, 150, 151). On the latter front, Plaintiff avers that "other employees … informed [her] that Henderson does not 'like white people.'" (¶ 124). She also maintains that Caucasian employees "are classified at lower job grade/classification than African Americans and [are] disciplined when African American employees are not." (¶ 50). Henderson, Johnson, and other African American JCDH managerial employees "have engaged in a practice to get rid of Caucasian employees and replace them with African American employees." (¶ 58; *see also* ¶¶ 54, 131). Likewise, Plaintiff accuses Johnson of certain racially discriminatory practices. To wit, Plaintiff says Johnson made or otherwise "participated in" decisions by which non-African American employees were

disciplined "for the same or similar issues" that African American employees were not and by which Caucasians were paid less and placed in a "lower classification/grade" than African Americans "performing the same or similar level of work." (¶ 55). Plaintiff also claims that Johnson "actively prevented the promotion of qualified non-African American employees so that less qualified African Americans get promoted instead." (¶ 55).

Based on the above allegations, Plaintiff's Second Amended Complaint raises claims divided into two counts. Count One asserts claims against the JCDH under Title VII, alleging discrimination because of sex, specifically because of Plaintiff's refusal to "conform to normal gender stereotypes." (¶ 60). In Count Two, she brings claims pursuant to 42 U.S.C. § 1983 against Henderson and Johnson, but not the JCDH. On those, Plaintiff seeks to recover for alleged race discrimination in violation of both 42 U.S.C. § 1981 and the Equal Protection Clause of the Fourteenth Amendment. On all her claims, Plaintiff demands compensatory damages, declaratory relief, and a permanent injunction prohibiting Defendants from violating Title VII, § 1981, or the Fourteenth Amendment. ("Prayer for Relief" following ¶¶ 105, 169).

Defendants have moved to dismiss all claims pursuant to Rule 12(b)(6), Fed. R. Civ. P. (Doc. 26). That motion is accompanied by a supporting brief. (Doc. 26-1). Plaintiff has filed a brief in opposition. (Doc., 30). Defendants have now filed

a reply thereto.  (Doc. 31).  As such, Defendants' motion to dismiss is ripe for decision.

## III.  DISCUSSION

### A.  § 1983 Claims for Damages against Henderson  and Johnson in their Official Capacity

The court first addresses Defendants' argument that Count Two is subject to dismissal to the extent it demands a judgment awarding money damages.  Again, Plaintiff there advances claims pursuant to § 1983 seeking redress for alleged race discrimination in violation of § 1981 and the Equal Protection Clause, and the claims are against Henderson and Johnson only.  Defendants maintain that, insofar as Plaintiff is asking for damages on those claims, they are barred because Henderson and Johnson are sued in their official capacity.

Section 1981 prohibits discrimination based on race in the making and enforcement of contracts, including contracts of employment.  *See* 42 U.S.C. § 1981; *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 450 (2008); *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 285-87 (1976).  However, the exclusive remedy against state actors for violation of the rights contained in § 1981 is a suit brought pursuant to § 1983, which establishes a procedural vehicle for seeking redress for violations of federal rights by persons acting under color of state law. *See Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 731-32 (1989); *Rioux v. City of Atlanta*, 520 F.3d 1269, 1273 n. 3 (11th Cir. 2008); *Butts v. County of Volusia*, 222

F.3d 891, 893 (11th Cir. 2000). Section 1983 is also the means by which a public employee may sue to redress a violation of rights guaranteed by the Equal Protection Clause, which also generally prohibits intentional race discrimination by state and local governments and their officials. *See, e.g., Bryant v. Jones*, 575 F.3d 1281 (11th Cir. 2009).

However, the Eleventh Amendment bars § 1983 claims for damages against State officials sued in their official capacity. *See Kentucky v. Graham*, 473 U.S. 159, 165-167 & n.14 (1985); *Alabama v. Pugh*, 438 U.S. 781, 782 (1978) (per curiam). Likewise, State officials sued in their official capacity for money damages are not "persons" subject to suit under § 1983. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989); *see also Arizonans for Official English v. Arizona*, 520 U.S. 43, 69 & n. 24 (1997). Rather, relief on § 1983 claims against State officials sued in their official capacity is limited to prospective, injunctive relief. *Will*, 491 U.S. at 71 n.10; *Graham*, 473 U.S. at 167 n. 14; *Ex parte Young*, 209 U.S. 123, 159-60 (1908).

As expressed in resolving the prior motion to dismiss Plaintiff's preceding complaint, the court agrees with Defendants that the JCDH is an agency of the State of Alabama for purposes of Eleventh Amendment immunity and is not a "person" subject to suit under § 1983. *See Ross v. Jefferson Cty. Dep't of Health*, 701 F.3d 655, 658-59 (11th Cir. 2012); *Taylor v. Jefferson Cty. Dep't of Health*,

2013 WL 4761050, at *1 (N.D. Ala. Sept. 4, 2013). And Plaintiff has expressly sued both Henderson and Johnson in their official capacity as agents or employees of the JCDH. (¶¶ 6, 7). As such, Henderson and Johnson partake of the JCDH's immunity such that the claims against them in their official capacity are due to be dismissed to the extent Plaintiff has demanded money damages under § 1983.[5]

The court would further observe, however, that Defendants appear to contend, or at least assume, that Plaintiff has sued Henderson and Johnson in their respective *official* capacities *only*. However, the court does not read the Plaintiff's pleading so narrowly. Rather, while the Second Amended Complaint is not a model of draftsmanship on the point, it is sufficient to afford fair notice that Plaintiff is suing Henderson and Johnson in both their official capacity *and individually*. Most directly, the caption immediately identifies Henderson as being sued "*individually and* acting as Jefferson County Manager," while similarly naming Johnson "*individually and* acting as Jefferson County Human Resources Manager." (Doc. 24 at 1 (emphasis added)). In addition, the body of Count Two includes allegations indicating that Plaintiff has sued Henderson and Johnson each "as an *individual* Defendant." (¶¶ 155, 156 (emphasis added)).

---

[5] The court notes that Defendants have not moved for, and, indeed, they would not be entitled to, a dismissal based on immunity insofar as the official-capacity claims against Henderson and Johnson seek prospective injunctive relief.

Of course, when sued in an "individual" or "personal" capacity, State officials do not enjoy blanket immunity from damages suits under § 1983. *Lundgren v. McDaniel*, 814 F.2d 600, 603 (11th Cir. 1987). A defendant may interpose a defense of qualified immunity to such individual-capacity claims, *id.* at 604, but neither Henderson nor Johnson has done so at this stage. Accordingly, Defendants have not established that the § 1983 damages claims are due to be dismissed on immunity grounds where Henderson and Johnson are sued individually.

### B. The Merits

Defendants also argue that all of Plaintiff's claims are due to be dismissed under Rule 12(b)(6) on the ground that the well-pled factual allegations of the Second Amended Complaint fail to support the existence of the necessary elements of liability. In Count One, Plaintiff has sued the JCDH under Title VII, claiming that she endured disparate treatment "because of stereotypes associated with her sex and gender and her non-conformity therewith." (¶ 61). Title VII makes it an "unlawful employment practice" for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The Eleventh Circuit recently reaffirmed that while Title VII's prohibition against "sex" discrimination does not render

homosexuality or sexual orientation a protected trait, the statute does reach

discrimination motivated by an employee's failure to conform to traditional gender

stereotypes otherwise. *Evans v. Georgia Regional Hosp.*, 850 F.3d 1248, 1254-55

(11th Cir.), *cert. denied*, ___ U.S. ___, 138 S. Ct. 557 (2017); *see also Glenn v.*

*Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011) ("Title VII bar[s] not just

discrimination because of biological sex, but also gender stereotyping—failing to

act and appear according to expectations defined by gender." (citing *Price*

*Waterhouse v. Hopkins*, 490 U.S. 228, 250-51 (1989)). And in Count Two,

Plaintiff claims that Henderson and Johnson are liable for discrimination Plaintiff

suffered "because of her race, Caucasian." (¶ 110). Again, those claims are

brought pursuant to § 1983 to redress alleged violations of § 1981 and the Equal

Protection Clause, both of which prohibit race discrimination in employment by

state and local governments and officials.

While Plaintiff's Title VII claims involve discrimination because of sex and

her § 1981 and equal protection claims alleged discrimination because of race, all

of her claims are otherwise generally subject to the same standards to establish

liability. *See Bryant*, 575 F.3d at 1296 n. 20. In this context, that means Plaintiff

must plead sufficient factual matter, taken as true, to establish two elements: (1)

that she suffered an adverse employment action, and (2) that such action was

motivated by the employer's consideration of the relevant statutorily-protected

characteristic. *See Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1246 (11th Cir. 2015). Defendants maintain that Plaintiff's pled allegations are not enough to meet either element, on any claim. Plaintiff argues to the contrary.

### 1. Adverse Employment Action

Defendants contend that Plaintiff's pleading does not show that she suffered an adverse employment action capable of supporting her claims. Indeed, "not everything that makes an employee unhappy" is actionable under federal civil rights statutes prohibiting discrimination in employment. *Higdon v. Jackson*, 393 F.3d 1211, 1219 (11th Cir. 2004) (*quoting Doe v. Dekalb County Sch. Dist.*, 145 F.3d 1441, 1449 (11th Cir. 1998) (citations and quotations omitted)). Rather, while a challenged action need not necessarily have economic consequences, it will be cognizable as unlawful discrimination only if it works "a *serious and material* change in the terms, conditions, or privileges of employment," judged objectively from the perspective of a reasonable employee. *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1238-40 (11th Cir. 2001) (emphasis original); *see also Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-68 (2006) (discussing "material adversity" in the context of Title VII's anti-retaliation provision, 42 U.S.C. § 2000e-3(a)).

The court concludes that Plaintiff has pled sufficient facts from which to infer that at least some of the negative treatment she cites may amount to adverse

employment action. That is the case with respect to actions that allegedly resulted directly in the denial of additional pay. *See Bass v. Bd. of Cty. Comm'rs, Orange Cty., Fla.*, 256 F.3d 1095, 1118 (11th Cir. 2001) ("[A]ctions which deprived [the plaintiff] of compensation which he otherwise would have earned clearly constitute adverse employment actions for purposes of Title VII"); *Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1561 (11th Cir. 1986) (no amount of diminished pay can be written off as beyond Title VII's protections on the ground that such loss was "de minimus"). In particular, Plaintiff's allegations that she was effectively denied a raise in that the JCDH denied her multiple requests both for "premium pay" and for a reclassification to a higher pay grade would be adverse job actions.

Plaintiff also alleges that Henderson gave her "poor performance evaluations based on false allegations." (¶ 33) Generally speaking, "[n]egative performance evaluations, standing alone, do not constitute adverse employment action" for purposes of a discrimination claim. *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1261 (11th Cir. 2001). Rather, courts are "reluctant to treat job performance memoranda as actionable ... where they do not trigger any more tangible form of adverse action such as a loss in benefits, ineligibility for promotional opportunities, or more formal discipline." *Davis*, 245 F.3d at 1241; *see also Brown v. Snow*, 440 F.3d 1259, 1265 (11th Cir. 2006). However, once a negative performance evaluation is used to justify the denial of a raise, the evaluation may be deemed an

adverse employment action. *See Crawford v. Carroll*, 529 F.3d 961, 971-72 (11th Cir. 2008); *Gillis v. Georgia Dep't of Corr.*, 400 F.3d 883, 888 (11th Cir. 2005). To that end, Plaintiff's latest pleading now further alleges that her "poor performance evaluations" "negatively impacted" her employment "in that [she] was denied pay [and] a higher job classification/grade." (¶ 35).

Even so, the court has doubts about whether Plaintiff has given Defendants fair notice of the grounds upon which these discrimination claims rest. Plaintiff has not pled anything else about these evaluations, including when they occurred, anything about how they were "poor" in substance, what "allegations" they relied upon or how they were purportedly "false," or just how the evaluations "negatively impacted" Plaintiff's pay. Ultimately, though, the court will assume without deciding that these allegations of "poor performance evaluations" are enough to survive a motion to dismiss on the adverse-job-action element.

Plaintiff also claims that, over the last fifteen years, the JCDH has reduced the number of employees working in her area and under her supervision and that, during the last four, she's been forced to assume a substantially increased workload, along with additional duties of an unidentified nature. In essence, that is a claim that the JCDH discriminated with regard to Plaintiff's work assignments. As such, it is a type of claim "our circuit does not favor." *Kidd v. Mando*

*American Corp.*, 731 F.3d 1196, 1203 (11th Cir. 2013). The Eleventh Circuit has

explained:

> "Work assignment claims strike at the very heart of an employer's
> business judgment and expertise because they challenge an employer's
> ability to allocate its assets in response to shifting and competing
> market priorities." *Davis*, 245 F.3d at 1244. And it is by now
> axiomatic that "Title VII is not designed to make federal courts sit as
> a super-personnel department that reexamines an entity's business
> decisions," *id.* at 1245 (internal quotation marks omitted) (*citing
> Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir.
> 1991)).

*Id.* at 1203-04. As a result, "[i]n the vast majority of instances, … an employee

alleging a loss of prestige on account of a change in work assignments, without any

tangible harm, will be outside the protection afforded by Congress in Title VII's

anti-discrimination clause." *Trask v. Secretary, Dep't of Veterans Affairs*, 822

F.3d 1179, 1194 (11th Cir. 2016) (*quoting Davis*, 245 F.3d at 1245).

The court again harbors doubts about whether the alleged changes in her

work assignments and duties suggest an adverse employment action under

Eleventh Circuit standards. Plaintiff does not claim that they altered her job title;

increased the hours she worked; or carried any loss in pay, advancement

opportunities, or prestige. That the JCDH continued to ask Plaintiff to shoulder

more work and assume additional unspecified duties over time may have made her

job incrementally harder. However, our court of appeals has rejected similar

claims for failure to establish an adverse employment action. *See Kidd*, 731 F.3d

at 1203-04 (rejecting a "demotion claim … grounded on a loss of supervisory responsibility" alone for lack of an adverse employment action); *Edwards v. Ambient Healthcare of Ga., Inc.*, 674 F. App'x 926, 930 (11th Cir. 2017)[6] (finding the plaintiff "did not allege that she suffered a materially adverse action" where she "did not allege that [the employer] cut her pay, took away her title, or did anything other than make her existing job duties more difficult."); *Redd v. UPS, Inc.*, 615 F. App'x 598, 603 (11th Cir. 2015) (holding that "conclusory and vague references to … unspecified increased work and hours" did not establish "a serious and material change to the terms and conditions of [the plaintiff's] employment."); *Gillespie v. City of Orlando*, 2018 WL 733688, at *3 (M.D. Fla. Feb. 6, 2018) ("Plaintiff's allegations of increased workload, without more, are insufficient to demonstrate that he suffered an adverse employment action."). Nevertheless, the court will again assume, without deciding, that these allegations are sufficient at this stage to support the existence of an adverse employment action.

Finally, Plaintiff would found her discrimination claims in part on allegations that Henderson subjected her to otherwise unspecified "harassment" and "discipline" over her sick leave. Those allegations, the court concludes, are simply too vague to establish an adverse employment action and fail to give Defendants fair notice of the grounds of the claims. For all that appears from the

---

[6] Unpublished opinions of the Eleventh Circuit Court of Appeals are not considered binding precedent; however, they may be cited as persuasive authority. 11th Cir. R. 36-2.

Second Amended Complaint, it cannot be reasonably inferred that Henderson did anything more than make critical remarks that had no further consequences. Because Plaintiff has not pled facts from which it might be reasonably inferred that this "harassment" and "discipline" had any material impact on her employment, they do not qualify an adverse employment action. *See Davis*, 245 F.3d at 1240-41; *Garrett v. University of Ala. at Birmingham Bd. of Trs.*, 507 F.3d 1306, 1309, 1316 (11th Cir. 2007); *see also Edwards v. Ambient Healthcare of Ga., Inc.*, 674 F. App'x 926, 930 (11th Cir. 2017) ("Criticisms" and "negative evaluations" are not themselves actionable adverse employment actions); *Patrick v. City of Port St. Lucie*, 2007 WL 9702580, at *4 (S.D. Fla. Dec. 4, 2007) (plaintiff failed to allege an adverse employment action where she "fail[ed] to even specify the discipline that she allegedly received"). Accordingly, Plaintiff's claims shall be dismissed to the extent they are founded on "harassment" and "discipline" related to her use of sick leave.

### 2.    Unlawful Discriminatory Intent

Defendants also argue that, even to the extent Plaintiff has pled adverse employment action, she has not alleged specific facts allowing a reasonable inference that any disparate treatment was motivated by either gender stereotyping or race. "Disparate-treatment cases present 'the most easily understood type of discrimination,' *Teamsters v. United States*, 431 U.S. 324, 335, n. 15 (1977), and

occur where an employer has 'treated [a] particular person less favorably than others because of' a protected trait. *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 985-86 (1988)." *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009). A plaintiff must establish "that the defendant had a discriminatory intent or motive" for taking an adverse, job-related action. *Id.* (quoting *Watson*, 487 U.S. at 986).

To survive a motion to dismiss, the complaint in such a case need not necessarily allege facts establishing a classic *McDonnell Douglas*[7] prima facie case of discriminatory intent based on circumstantial evidence. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510-13 (2002). Nonetheless, plaintiff still must plead enough factual matter, taken as true, plausibly suggesting intentional, unlawful discrimination. *See Evans*, 850 F.3d at 1253; *see also Surtain*, 789 F.3d at 1246; *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1300-01 (11th Cir. 2010); *Jackson v. BellSouth Telecomm.*, 372 F.3d 1250, 1270 (11th Cir. 2004). A plaintiff may meet that burden by alleging facts supporting that the employer treated her less favorably than a similarly-situated comparator outside her protected class. *See Faulk v. City of Orlando*, 731 F.2d 787, 790 (11th Cir. 1984); *Glover v. Donahoe*, 626 F. App'x 926, 931 (11th Cir. 2015); *Wells v. Willow Lake Estates, Inc.*, 390 F. App'x 956, 959 (11th Cir. 2010); *see also Crawford*, 529 F.3d at 975 (recognizing that plaintiff typically raises an inference of discriminatory intent on disparate pay

---

[7] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

claims under Title VII by asserting that she occupies a position similar to that of a higher paid employee who does not share her protected characteristic).

However, the Eleventh Circuit has emphasized that the plaintiff and any would-be comparators "must be 'similarly situated *in all relevant respects.*'" *Griffin Industries, Inc. v. Irvin*, 496 F.3d 1189, 1204 (11th Cir. 2007) (*quoting Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1316 (11th Cir. 2003) (emphasis in *Griffin Industries*). This principle generally prevents "courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Burke-Fowler v. Orange County*, 447 F.3d 1319, 1323 (11th Cir. 2006) (quotation omitted). Accordingly, a plaintiff cannot "simply rely on broad generalities in identifying a comparator." *Griffin Industries, Inc. v. Irvin*, 496 F.3d 1189, 1204 (11th Cir. 2007); *see also Jackson*, 372 F.3d at 1272-74 (allegation that defendants' treatment of African American plaintiffs "differs markedly from their treatment of Caucasian plaintiffs" in other cases held insufficient to raise an inference of discriminatory intent to support a claim under § 1981 where plaintiffs "failed to identify any specific nonminority employees … who were treated differently in other similar cases"); *GJR Investments, Inc. v. County of Escambia, Fla.*, 132 F.3d 1359, 1367-68 (11th Cir. 1998) (allegations that "nameless, faceless 'other' permit applicants" or "even 'all other' applicants, were treated differently, do not state an equal protection claim; a complaint must attempt to show in some

fashion that these 'other' applicants were situated similarly to the plaintiff."),
*overruled in part on other grounds as recognized in Randall v. Scott*, 610 F.3d
701, 709 (11th Cir. 2010); *Arafat v. Sch. Bd. of Broward Cty.*, 549 F. App'x 872,
874 (11th Cir. 2013) (holding that complaint that "generically referenced younger
males" as receiving more favorable treatment did "not plausibly suggest intentional
discrimination").

Plaintiff attempts to support her disparate treatment claims with a variety of
allegations to the effect that the JCDH afforded her less favorable treatment than
other female employees who conformed to traditional female stereotypes and less
favorable treatment than employees of other races.  In particular, Plaintiff asserts
that other employees outside her protected class, including Defendant Johnson,
LaMonte Augustus, and others working in Plaintiff's department under
Henderson's supervision, were paid more, classified higher, received "premium
pay," were "properly classified," were not required to perform tasks outside their
job description, or were not "disciplined" when they supposedly should have been.

However, Plaintiff does not aver that any of those other employees was
performing a job at all resembling Plaintiff's or was otherwise similarly situated to
her in respects relevant to the claim.  Plaintiff laments, for example, that she was
denied "premium pay" while such was given to Johnson.  But Plaintiff offers
nothing to suggest that she, the "Print Shop/Mail Room Supervisor," is similarly

situated to Johnson, the JCDH's "Human Resources Manager," as relates to "premium pay," a term Plaintiff has neglected to define, or, indeed, to any other aspect of compensation.

Plaintiff also claims that Augustus was classified higher and was paid more than she was despite that he "does not perform the work of [his] pay grade," does not "perform his job duties satisfactorily," and performs "less duties" and "substantially less work" than Plaintiff does. (¶¶ 51, 53, 130). However, Plaintiff does not identify Augustus's title or job duties, nor does she claim even generally that they were similar to hers. Indeed, to the contrary, Plaintiff has alleged that Augusts and other African American employees treated more favorably with respect to pay and job classification "do not perform the same … type of work as Plaintiff." (¶ 130). Plaintiff further avers that Augustus harassed other employees because of race and sex but was not "demoted" or "disciplined," other than, apparently, having his authority over other employees withdrawn. But, again, Plaintiff does not claim she was ever demoted, nor does she contend that she suffered any tangible discipline in circumstances similar to those in which Augustus was not.[8] Identifying a comparator is not as simple as claiming that

_____

[8] Plaintiff does claim that she was subjected to "harassment" and "discipline" over her use of sick leave or time off whereas Augustus allegedly "abused time off and was not disciplined." (¶ 85). As previously explained, however, Plaintiff's allegations are insufficient to indicate that the "harassment" and "discipline" to which she refers in this context had any tangible effect on her employment, as required to establish an adverse action capable of supporting her discrimination claims.

some employee outside her protected class in some other job was a bad worker, got paid more, or engaged in some kind of misconduct only to escape punishment. Ultimately, a plaintiff must also allege facts supporting that she was also similarly situated to the other employee who received better treatment. Absent that, differences in treatment do raise an inference that the employer was motivated by consideration of a prohibited characteristic. *See generally Jackson*, 372 F.3d at 1273 ( "When comparing similarly situated individuals to raise an inference of discriminatory motivation, the individuals must be similarly situated in all relevant respects … since different treatment of *dissimilarly* situated persons does not violate civil rights laws" (emphasis original, citations and internal quotation marks omitted)).

One of Plaintiff's principal complains is that the JCDH denied her repeated requests for additional employees to help her with her workload, as well as for "premium pay" and reclassification to a higher pay grade based on her performance of duties outside her job description and classification. Unlawful intent cannot be inferred, however, solely from the fact that an individual with a protected characteristic suffered an adverse employment action. *See Wright v. Southland Corp.*, 187 F.3d 1287, 1290 (11th Cir. 1999) (Tjoflat, J., plurality opinion). It is also expected that rational employers will conserve financial resources, including by trying to obtain maximum work from each employee for

minimum cost.  *Cf. Board of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356,

372 (2001) ("[I]t would be entirely rational … for a state employer to conserve

scarce financial resources by hiring employees who are able to use existing

facilities ….").  As such, Plaintiff's allegations regarding her pay and work

assignments, without more, do not raise an inference of unlawful discriminatory

intent.

Plaintiff has not alleged that another employee outside her protected class

performed a job similar to hers and received premium pay or was classified higher.

*See Johnson v. Auburn Univ.*, 403 F. Supp. 2d 1101, 1109 (M.D. Ala. 2005)

(recognizing that an employee may make out a prima facie case for failure to

reclassify by showing that "positions held by comparable white employees were

reclassified and upgraded" (citing *Moore v. Devine*, 767 F.2d 1541, 1546 (11th

Cir.1985)), *aff'd*, 193 F. App'x 955 (11th Cir. 2006).  Nor does she claim that any

other employee, in any kind of job, was actually given premium pay or was

reclassified based on performance of duties outside of their job description and

classification.  *Cf. Douglas Asphalt Co. v. Qore, Inc.*, 541 F.3d 1269, 1275 (11th

Cir. 2008) (plaintiff's allegation that the government's use of testing procedures

was "unprecedented" was insufficient to state an equal protection claim, given

failure to identify a similarly situated comparator not subjected to the same

procedures).   Rather, Plaintiff contends only that other employees outside her

protected class were not required to perform duties outside of their job description

and classification.   The court concludes, however, that such an allegation is

insufficient to support an inference of discrimination without some indication that

Plaintiff was being made to perform materially more or materially less desirable

job duties or assignments than some other employee outside her protected class

who was otherwise doing the same or a materially similar job.

Falling back, Plaintiff argues that, even if she can't identify a similarly

situated employee outside her protected class who received better treatment, she

does not have to do so to survive a motion to dismiss.  Indeed, the presence of a

comparator is not an essential element of Plaintiff's claims.  *See Holland*, 677 F.3d

at 1063 n. 7.  Thus, the court agrees with Plaintiff that she would be due to prevail

at this stage if she has pled "a convincing mosaic" of circumstances, *Smith v.

Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011), that otherwise raise

an inference of unlawful discriminatory intent.  *See El-Saba v. University of S.

Ala.*, 2015 WL 5849747, *13, 18 (S.D. Ala. Sept. 22, 2015); *see also Chapter 7

Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1255-56 (11th Cir. 2012) ("[A]

plaintiff may use non-comparison circumstantial evidence to raise a reasonable

inference of intentional discrimination …").  For example, such an inference may

be created by allegations regarding "the employer's criticism of the plaintiff's

performance in … degrading terms" that reference the plaintiff's protected

characteristic, "invidious comments about others in the employee's protected group, … or the sequence of events leading to the [adverse employment action]." *El-Saba*, at *13 (quoting *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015)).

The problem for Plaintiff is that her well-pled facts simply do not form such a "convincing mosaic." Not only has Plaintiff failed to identify similarly situated comparator employees, she also has not alleged that Henderson, Johnson, or anyone else at the JCDH made any statements or comments indicative of an animus or bias related either to a failure to conform to gender stereotypes, to "sex" as a protected trait otherwise[9], or to race[10]. To be sure, Plaintiff's complaint

_____

[9] The court would here recognize that the first two iterations of Plaintiff's complaint raised Title VII sex discrimination claims based not only on non-conformity with gender stereotypes but also on Plaintiff's homosexuality. (*See* Doc. 1; Doc. 11). When the Health Department moved to dismiss, the court agreed that the latter Title VII claims for sexual orientation discrimination were barred under the Eleventh Circuit's decision in *Evans*. (Doc. 23 at 12). Plaintiff emphasized, however, that her gender non-conformity theory survives *Evans*, and she further insisted that she had stated such claims. In support, she relied in part on allegations that Henderson had made it clear that he did not condone Plaintiff's "lesbian lifestyle," as evidenced by a comment he purportedly made: "It's Adam and Eve, not Adam and Steve." (*Id.* at 16-17). Plaintiff also cited the fact that the Health Department had denied her request for benefits for her "female partner." (*Id.*) The court determined, however, that such allegations related directly to Plaintiff's homosexuality and that she could not, therefore, rely on them to prove a gender non-conformity claim. (*Id.* at 17-19). To do otherwise, the court explained, would allow a plaintiff to circumvent the holding in *Evans* that sexual orientation is not a protected trait under Title VII simply by recasting homosexuality as a species of gender non-conformity. (*Id.*) That kind of bootstrapping would, the court reasoned, eviscerate the distinction between sexual orientation and gender non-conformity under Title VII that the Eleventh Circuit just reaffirmed in *Evans*. (Doc. 23 at 17-19). Indeed, this court went further to recognize that, because sexual orientation is *not* protected under Title VII, Plaintiff's allegations that the Health Department treated her badly because of her homosexuality, a lesbian lifestyle, and having a same-sex partner actually *undercut* her gender non-conformity claims because those allegations tend to support that the Health department discriminated on a basis that remains lawful in the Eleventh Circuit. (*Id.* at

includes a host of sweeping allegations that Henderson, Johnson, and other managers have a general pattern and practice of discriminating both against female employees who do not conform to gender stereotypes and against non-African Americans.[11]  Those allegations, however, are set forth in vague and conclusory terms and contain insufficient facts from which reasonably to draw the invited inferences.  Because Plaintiff "fails to show the existence of a similarly-situated

19-21).  Plaintiff's latest amended complaint, however, omits any reference to Plaintiff's homosexuality, her "lesbian lifestyle," or that she has a female partner.

[10] Plaintiff also asserts that "Defendants' conduct and the conduct of [other JCDH] employees have [sic] been so severe or pervasive as to create a racially harassing and discriminatory working environment to which Plaintiff was subjected." (¶ 162). It is well established that Title VII may, of course, be violated not only where a protected characteristic motivates the employer to take discrete, adverse employment actions, such as demotion, discharge, or refusal to hire or promote, etc., but also where a plaintiff is forced to endure a hostile work environment arising from the cumulative effects of discriminatory harassment.  *See National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114-16 (2002); *Harris v. Forklift Systems, Inc.*, 510 U.S. 17 (1993).  That is so despite that fact that individual episodes of such harassment may not result in any economic or otherwise tangible effects on the plaintiff's employment and may not be independently actionable under Title VII.  *Morgan*, 536 U.S. at 115.  However, even assuming such a claim might be otherwise viable here against individual defendants like Henderson and Johnson under § 1983, the court concludes that Plaintiff's factual allegations are insufficient from which to infer that she endured harassment that was both racially motivated and so severe or pervasive, viewed objectively, that it rose to the level of an actionable, racially hostile work environment.

[11] (*See, e.g.*, ¶ 56 ("Non-African American … employees have complained that they are being discriminated against based on their race by Dolores Johnson and other employees, but no action has been taken to address and stop the race discrimination"); ¶ 57 ("Mark Wilson, the health Officer for Jeffco, previously stated in an employee round table meeting that there is discrimination throughout Jeffco"); ¶ 58 ("Plaintiff believes Dolores Johnson, Jackie Robinson [sic], and other African American human resources or managerial employees have engaged in a practice to get rid of Caucasian employees and replace the[n] [sic] with African American employees"); ¶ 93 ("Defendants, upon information and belief, have a habit and/or practice of discriminating against female employees that do not conform to gender stereotypes and subjecting them to a difference in terms and conditions of employment."); ¶ 135 (Plaintiff, Charlene Whyte, Carlos Sanchez and Sherry Geter, have all filed lawsuits alleging race discrimination and have made claims that Johnson discriminated against Caucasians and non-African employees).

employee [and] no other plausible allegation of discrimination is present," Defendants' motion to dismiss is due to be granted. *Arafat*, 549 F. App'x at 874 (*citing Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)); *cf. Smith, supra* (applying a similar standard to assess the sufficiency of the plaintiff's non-comparator evidence to raise a necessary prima facie inference of discriminatory intent at summary judgment).

## IV. CONCLUSION

Based on the foregoing, Defendants' motion to dismiss the Second Amended Complaint (Doc. 26) is due to be **GRANTED**. A separate final order will be entered.

**DONE**, this the 10th day of August, 2018.

_____
**JOHN E. OTT**
Chief United States Magistrate Judge